<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____  :
CASCO, individually and on behalf of all  :
others similarly situated  :
                                                         :
                    Plaintiff,            :          Civil No. 16-2084 (RBK/JS)
                                                         :
                    v.                      :          **OPINION**
                                                         :
PONZIOS RD, INC., et al.,          :
                                                         :
                    Defendants.        :
_____  :

**KUGLER**, United States District Judge:

Presently before the Court is Plaintiff Oscar Casco's Motion for Partial Summary Judgment under the New Jersey Wage and Hour Law (Doc. No. 104), Motion for Final Collective Action Pursuant to Section 216(b) of the Fair Labor Standards Act (Doc. No. 109), and Motion to Strike Defendant's Response to Plaintiff's Statement of Material Facts (Doc. No. 124). For the reasons expressed below, Plaintiff's Motion to Strike is **DENIED**, Motion for Partial Summary Judgment is **GRANTED**, and Motion for Final Collective Action Pursuant to Section 216(b) of the FLSA is **GRANTED**.

**I.        BACKGROUND**

This employment dispute concerns whether Defendant Ponzios RD, doing business as Metro Diner, could pay its "tipped employees," like bussers and servers, less than the minimum wage by using a "tip credit" under the New Jersey Wage and Hour Law ("NJWHL").

**A.  Factual Background**

Defendant Metro Diner employed Lead Plaintiff Oscar Casco ("Casco") as a busser and Opt-In Plaintiff Tina Blemings ("Blemings") as a server in its New Jersey location in Brooklawn, New Jersey. (Doc. No. 105, Pls.' SMF at ¶¶ 1, 3, 4, 7). Casco worked for Defendant for approximately six months beginning in May 2014 and earned $3.50 per hour plus tips. (*Id.* at ¶ 4); *see also* (Doc. No. 1, Compl. at ¶ 27). Blemings, by contrast, worked for Defendant for about four years beginning in May 2011 and earned $2.15 per hour plus tips. (Doc. No. 105, Pls.' SMF at ¶¶ 7,8, 9). Metro Diner considered waitresses, waiters, and buys boy as tipped employees and would credit as wages to these employees the difference between the minimum wage and their hourly wage.(Doc. No. 116, Exhibit I at 37, 39–40).

Defendant provided all new hires with a form entitled "METRO DINER Notice to Tipped Employee," which provided in pertinent part:

- The <u>amount of cash wages</u> to be paid to you per hour will be:

  > $2.15 per hour for waitstaff/servers.
  > $3.50 per hour for buspersons/bussers.

- <u>It is your responsibility to declare/report all tips received</u>.  Assuming you have received a sufficient amount of tips (at least the amount per hour reflected below), this amount will be the tip credit your employer . . . will take and credited to you as wages paid:

  > $6.23 per hour for waitstaff/servers.
  > $4.88 per hour for buspersons/bussers

(Doc. No. 116, Exhibit I at 21–22); (Def.'s SMF at ¶ 13). The Notice further informed tipped employees, in all capital letters, that:

> UNLESS WE ARE INFORMED OTHERWISE WE WILL ASSUME THAT AT THE VERY LEAST THE ABOVE NOTED TIP CREDIT AMOUNTS (no less) HAVE BEEN RECEIVED IN YOUR PAY WEEK AND WILL BE CREDITED TO YOU AS WAGES AND TAXED ACCORDING TO THE LAW.

(*Id.*)

At the end of each shift, waiters and waitresses were required to report their total tips—both cash and credit card tips—by entering the amount into a point of sale ("POS") system before clocking out. (Doc. No. 116, Exhibit J at 69, 93). After clocking out, a report was generated which the waitresses and waiters would then take to the cashier in order to receive cash for their credit card tips. (*Id.* at 89, 101). Included on this report was the credit card tips earned by the waiters or waitresses along with the gross sales they made for that day.[1] (*Id.* at 101–102). A certain percentage of the waiter or waitresses' gross sales was deducted and distributed to the bus boys as tips. (*Id.* at 97, 103). At one point, the waiters and waitresses were distributing the tips to the bus boys directly. (*Id.* at 70). However, this practice changed and now management distributes the tips to the bus boys. (*Id.* at 101).

Because waiters and waitresses often allegedly failed to report their cash tips, Defendant assumed they received sufficient gratuities to meet the minimum wage requirement by recording as such on payroll. (*Id.* at 63). For instance, in reviewing a tip credit report generated by Defendant, Mr. Kolovos discussed how management records tips when employees report that they earned zero cash tips:

> Counsel: Now, it says that she had $1,337.07 in gross receipts for food and beverage; do you see that?
>
> Mr. Kolovos: Yep.
>
> Counsel: And she had zero percent total tips?
>
> Mr. Kolovos: that's 'cause [sic] she didn't declare anything.
> Counsel: But the $41 –
>
> Mr. Kolovos: She did get $41 in – it appears in credit card tips that we paid her.
>
> Mr. Kolovos: But, again, see how this is difficult for me to police and say, hey, you didn't make any other tips, it's highly unlikely.

[1] Gross sales means the "total sales that [the] waiter or waitress [had] that day. . . . like how much food she sell[s] and beverages." (Doc. No. 116, Exhibit I at 30).

3

Counsel: What does Mr. Fakouras do with the information in this document?

Mr. Kolovos: Well some – some employees or wait staff, as you can see, do report their tips or what appears to be, you know, their tips. *So he utilizes what they've—what tips they report here.* If it is zero, for example, which is unreasonable, well, then, we – as indicated in the notice, the minimum—the minimum as put in.

Counsel: And by the minimum – I'm sorry?

Mr. Kolovos: as it indicated in the document, unless were told otherwise, we gonna [sic] at least take this tip credit.

(*Id.* at 95–96) (emphasis added). Mr. Fakouras, also a co-owner of Metro Diner, similarly testified in his deposition how he reports employees' tips on payroll when they record receiving zero cash tips:

Counsel: Okay. So, if, just to close the loop in this, if a server puts down that they received zero in cash tips for the week, but they don't complain to you that they don't receive minimum wage, you send it to payroll as they received minimum wage?

Mr. Fakouras: Correct.

(Doc. No. 116-11, Exhibit I at 64). Metro Diner also provided its employees with meal credits which allowed them to "order anything they want up to $8 and – they can order filet mignon, if they want, but they would get an $8 credit and have to pay the difference." (Doc. No. 116-13, Exhibit J at 113). A prorated meal credit of up to $10 for 40 hours worked would be applied to the gross weekly pay of the each tipped employee. (Doc. No. 105, Pls.' SMF at ¶ 47); (Doc. No. 116, Def.'s SMF at ¶ 47). Mr. Fakouras explained that the meal credit is based on the retail cost of the food—that is, the price listed on the menu—as opposed to the actual cost to Metro Diner:

Counsel: So, when I asked you before about whether or not the $8 is a discount taken off the retail cost of food, by retail I mean the food on the menu?

Mr. Fakouras: Correct.

4

(Doc. No. 116-11, Exhibit I at 67).

**B.  Procedural History**

On April 14, 2016, Casco brought this action (which Blemings subsequently joined) on behalf of a nationwide collective class action under the FLSA. (Doc. No. 1). Casco also brought a class action under Federal Rule of Civil Procedure 23 on behalf of himself and a New Jersey class of tipped employees. (*Id.*). The Complaint contains five counts: (1) FLSA minimum wage violations (Count One); (2) FLSA overtime wage violations (Count Two); (3) New Jersey minimum wage violations (Count Three); (4) New Jersey overtime violations (Count Four); and (5) a New Jersey common law unjust enrichment claim (Count Five). (*Id.*). In answering the Complaint, Defendant denied, among other things, that it failed to pay its tipped employees less than the minimum wage. (Doc. No. 9 at ¶¶ 81–88).

Plaintiffs sought summary judgment under the FLSA and NJWHL as to the defense that Defendant complied with the legal notification requirements to pay its tipped employees less than the minimum wage by claiming a tip credit. (Doc. No.77). In our prior opinion, we held that Defendant failed to meet the notification requirement to take a tip credit under the FLSA and therefore found Defendant liable for the full minimum wage. (Doc. No. 94). We granted summary judgment in favor of Plaintiffs solely on that issue. (*Id.*). We denied Plaintiffs' motion for summary judgment on the New Jersey Wage and Hour Law claim because it was unclear, given the lack of briefing, whether the FLSA and NJWHL paralleled each other to such an extent that a ruling under one was dispositive of a ruling under the other. (*Id.*). Plaintiffs now move for partial summary judgment on the New Jersey Wage and Hour Law claim. (Doc. No. 104). They also filed a motion for final collective action pursuant to 216(b) of the FLSA and motion to strike Defendant's response to Plaintiffs' statement of material facts. (Doc. No. 109, 124).

## II.     LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law*." Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Id.* The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 233 (3d Cir. 2002). The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir.

1998), and credibility determinations are for the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.  Motion to Strike

As a threshold matter, we must resolve Plaintiffs' Motion to Strike because its outcome determines whether Plaintiffs' statement of material facts is deemed admitted for purposes of this motion. According to Plaintiffs, Defendant's response to its current statement of material facts must be stricken because this Court previously ruled that Plaintiffs' statement of material facts were deemed admitted and the same statement of material facts has been attached to this motion. Defendant argues the plain text of Local Civil Rule 56.1 undermines Plaintiff's contention because it only requires undisputed facts to be deemed admitted for purposes of "the" summary judgment motion then before the court.

Local Civil Rule 56.1 provides that:

on motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. . . . The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

In the current context, the plain text of the rule does not aid either party. The current motion for partial summary judgment could equally be construed as a renewed motion or a second and distinct motion. As a renewed motion, it may still constitute "the" summary judgment motion, but as a second motion, it would not. In any event, we need not reach this issue because a "court may excuse the failure to submit a Rule 56.1 statement where there is no evidence of bad faith"

or where the interests of justice so require. *Brandt v. Feibusch*, No. CIV.A. 10-4223 FLW, 2012 WL 1937563, at *10 (D.N.J. May 29, 2012). Because there is no indication of bad faith on the part of Defendant, we exercise our discretion to proceed to the merits of this motion. Accordingly, Plaintiffs' Motion to Strike is **DENIED.**

### B.  New Jersey Wage and Hour Law Tip Credit

Plaintiffs seek a grant of summary judgment on the issue that Defendant failed to comply with the minimum wage requirements under the New Jersey Wage and Hour Law. Specifically, that Defendant failed to comply with the requirements set forth in New Jersey's Administrative Code that permit employers to take tip credits and meal credits for employees that receive gratuities.

New Jersey's Wage and Hour Law declares that it is:

> the public policy of this State to establish a minimum wage level for workers in order to safeguard their health, efficiency, and general well-being and to protect them as well as their employers from the effects of serious and unfair competition resulting from wage levels detrimental to their health, efficiency and well-being.

N.J.S.A. 34:11–56a. The NJWHL was designed to "protect employees from unfair wages and excessive hours." *Hargrove v. Sleepy's*, LLC, 220 N.J. 289, 304 (2015). To further this goal, "[t]he WHL establishes not only a minimum wage but also an overtime rate for each hour of work in excess of forty hours in any week for certain employees." *Id.* Given the NJWHL's remedial purpose, courts have construed it broadly. *Branch v. Cream-O-Land Dairy*, 244 N.J. 567, 583 (2021).

The regulations interpreting the NJWHL provide that employees in the restaurant industry must be paid minimum wage. N.J.A.C. 12:56–14.2. However, as is common in the restaurant industry, employees—waitresses, waiters, and bus boys—are often paid through a combination of an hourly wage set by their employer and tips or gratuities received from

8

customers. New Jersey Administrative Code 12:56–14.4 permits employers to avail themselves of this practice. Specifically, it provides that:

> (a) The wage rate established in this subchapter shall be acceptable in those occupations where gratuities or food and/or lodging are actually received.
>
> (b) Employers subject to the Fair Labor Standards Act must pay the Federal cash wage rate of $2.13 and must demonstrate that the balance of the $5.05 minimum wage required under State law is paid through gratuities in accordance with N.J.A.C. 12:56–4 and 12:56–8. Employers not subject to the Fair Labor Standards Act must demonstrate that the total wage, including cash and gratuities, equals the $5.05 minimum wage required under State law in accordance with N.J.A.C. 12:56–4 and 12:56–8.

N.J.A.C. 12:56–14.4. This regulation effectively allows employers to take a tip credit so long as: (1) the employees are in an occupation where they actually receive gratuities; (2) the employer is subject to the FLSA; and (3) the employer can demonstrate that its employees receive sufficient gratuities to meet minimum wage in accordance with N.J.A.C. 12:56–4 and 12:56–8. This last requirement is the focal point of the current dispute.

N.J.A.C. 12:56–4 and 12:56–8, in turn, set forth several requirements that are relevant here. N.J.A.C. 12:56–4 imposes an affirmative obligation on both employers and employees to record and report any gratuities received. Specifically, employers are required to "maintain and preserve payroll or other records containing the total gratuities received by each employee during the payroll week." N.J.A.C. 12:56–4.6. Likewise, employees that receive gratuities are required to "report them either daily or weekly as required by the employer." N.J.A.C. 12:56–4.7.

N.J.A.C. 12:56–8.3(a) sets forth the evidence an employer may rely on to determine the cash gratuities actually received by an employee. Employers may rely on: (1) statements furnished by an employee; or (2) amounts indicated on customer billing, credit card invoices or other customer charge accounts wherein there is an indicated service charge or gratuity designated for the employee and payable to the employee. N.J.A.C. 12:56–8.3(a). Employers

may also agree in advance with their employees on how they will handle gratuities. N.J.A.C. 12:56–8.4(a). Specifically, if employers agree in advance with employees, the employer may establish an average value of gratuities received by an employee based on "a percentage of gross sales apportioned on the basis of hours worked among the employees being tipped." *Id.* This percentage may be: (1) derived from a representative sampling of the amount of gratuities actually received by the employee; (2) 10% of gross sales; or (3) some other agreed upon method that is approved by the Commissioner. N.J.A.C. 12:56–8.4(a).

Plaintiffs argue Defendant violated N.J.A.C. 12:56–14.4 because it did not comply with N.J.A.C. 12:56–8.3. Specifically, because Defendant did not rely on statements furnished by waitresses and waiters nor amounts indicated on customer billing, credit card invoices, or other customer charge accounts to determine cash gratuities when these employees reported zero cash tips, and instead changed payroll records to reflect that the employees received minimum wage, Defendant cannot actually show that these employees received minimum wage. Put differently, because N.J.A.C. 12:56–14.4 conditions an employers' use of a tip credit on compliance with 12:56–8, and Defendant determined cash gratuities based on a method not listed in 12:56–8.3, its tip credit was impermissible. Plaintiffs also argue that Defendant did not use the option set forth in N.J.A.C. 12:56–8.4(a) because there was no prior agreement with its employees, there is no indication that tip amounts were based on the gratuities actually received by waitresses or waiters when they reported cash tips as zero, and there is no evidence to suggest that another method was approved by the Commissioner. Thus, Plaintiffs maintain that because Defendant did not use the method set forth in N.J.A.C. 12:56–8.4(a) or 12:56–8.3 to determine the gratuities actually received when waiters and waitresses reported zero cash tips, Defendant cannot demonstrate compliance with N.J.A.C. 12:56–14.4.

10

Defendant raises multiple arguments in response. First, it argues there is a genuine dispute of material fact precluding the grant of summary judgment because the diner owners testified that each shift, employees did in fact receive the requisite gratuities to satisfy the minimum wage requirement. Further bolstering this point, according to Defendants, is the fact not one single complaint was ever raised by servers that their pay was short or that they failed to receive minimum wage. Second, it contends there is a genuine dispute of material fact because there are numerous instances where management did rely on statements furnished by waiters and waitresses to determine the gratuities actually received. Third, Defendant argues that the Tip Credit notice provided to and signed by employees upon being hired constitutes an agreement under N.J.A.C. 12:56–8.4(a) and therefore Defendant did not violate N.J.A.C. 12:56–14.4.

This is not a close call. It is very clear that when waiters and waitresses reported cash tips as zero, Defendant did not employ any of the methods in N.J.A.C. 12:56–8.4(a) or 12:56–8.3 to determine the actual gratuities received by these employees. Instead, as two of the co-owners admitted during their depositions, when waiters or waitresses reported cash tips as zero, management would record the gratuities actually received by these employees as sufficient to meet the minimum wage requirement. For instance, during Mr. Fakouras deposition, he was asked what his practice was when servers report zero cash tips:

> Counsel: Okay. So, if, just to close the loop in this, if a server puts down that they received zero in cash tips for the week, but they don't complain to you that they don't receive minimum wage, you send it to payroll as they received minimum wage?
>
> Mr. Fakouras: Correct.

(Doc. No. 116-11, Exhibit I at 64). Mr. Kolovos, also a co-owner, similarly testified during his deposition that if waiters or waitresses report zero cash tips, management records those employees as receiving minimum wage:

> Counsel: Now, it says that she had $1,337.07 in gross receipts for food and beverage; do you see that?
>
> Mr. Kolovos: Yep.
>
> Counsel: And she had zero percent total tips?
>
> Mr. Kolovos: that's 'cause she didn't declare anything.
>
> Counsel: But the $41 –
>
> Mr. Kolovos: She did get $41 in – it appears in credit card tips that we paid her.
>
> Mr. Kolovos: But, again, see how this is difficult for me to police and say, hey, you didn't make any other tips, it's highly unlikely.
>
> Counsel: What does Mr. Fakouras do with the information in this document?
>
> Mr. Kolovos: Well some – some employees or wait staff, as you can see, do report their tips or what appears to be, you know, their tips. *So he utilizes what they've—what tips they report here.* If it is zero, for example, which is unreasonable, well, then, we – as indicated in the notice, the minimum—the minimum as put in.
>
> Counsel: And by the minimum – I'm sorry?
>
> Mr. Kolovos: as it indicated in the document, unless were told otherwise, we gonna at least take this tip credit.

(Doc. No. 116-13, Exhibit J at 95–96). Indeed, Defendant does not dispute that this is management's practice when zero cash tips are reported, it merely disputes Plaintiff's characterization of this practice. (Doc. No. 105, Pls.' SMF at ¶ 37); (Doc. No. 116, Def.'s SMF at ¶ 37). Given this concession, we find there is no genuine dispute of material fact that Defendant failed to comply with N.J.A.C. 12:56–8.4(a) or 12:56–8.3 and consequently N.J.A.C. 12:56–14.4. But this conclusion is limited to the narrow circumstance where zero cash tips were reported. As the above italicized language suggests, where waiters and waitresses did report cash tips,[2] Defendant relied on those reports. Thus, Plaintiff is entitled to summary judgment only on

---

[2] To be more explicit, the italicized quote, "he utilizes what they've – what tips they report here," suggests that Defendant relied on waitresses and waiters' reports when they reported an amount other than zero. Although the

the narrow point that Defendant failed to comply with the requirements set forth in N.J.A.C. 12:56–14.4 when waiters and waitresses reported cash tips as zero.

Defendant's first argument to the contrary misses the point. N.J.A.C. 12:56–14.4 requires employers to demonstrate their employees are paid sufficient gratuities such that the total, including cash and gratuities, meets minimum wage in accordance with N.J.A.C. 12:56–4 and 12:56–8. While the co-owners testimony that servers received minimum wage every shift may raise a genuine issue of material fact as to whether Defendant can demonstrate that its employees received minimum wage, it does not raise a genuine issue of material fact with respect to whether Defendant complied with N.J.A.C. 12:56–8. By the plain text of the regulation, compliance with N.J.A.C. 12:56–14.4 is conditioned, in part, on compliance with N.J.A.C. 12:56–8. Therefore, because there is no genuine dispute that Defendant failed to comply with N.J.A.C. 12:56–8, it could not have complied with N.J.A.C. 12:56–14.4.

As noted above, we agree with Defendant's second argument and limited our holding accordingly. Defendant's third argument, that the Tip Credit notice form provided to and signed by employees constitutes an agreement under N.J.A.C. 12:56–8.4(a), is unconvincing because the form does not even list one of the statutory methods for calculating gratuities. The first method, a representative sample of the actual gratuities received by servers, is not listed in the Tip Credit Notice form as the method for calculating gratuities. The second method, 10% of gross receipts,[3] is similarly not listed in the Tip Credit Notice form. Rather, the form merely states Defendant will credit as wages paid the maximum tip amount allowable under law to

---

sentence is ambiguous, drawing all reasonable inferences in favor of the nonmoving party, we construe it as referring to cash tips.
[3] While Defendant may have had a practice of tipping bus boys 10% of waiters and waitress' gross receipts, Defendant does not contend that this practice was part of the alleged agreement. Nor could it because the plain terms of the Tip Credit Notice form show that tips were assumed to be sufficient to meet minimum wage unless Defendant was informed otherwise, not calculated as 10% of gross receipts.

waitstaff and bussers unless it is informed otherwise. Thus, by the plain terms of the form, it is clear that Defendant did not agree with its employees that gratuities would be calculated based on any of the first two methods set forth in N.J.A.C. 12:56–8.4(a). Lastly, the third method set forth in this regulation is not available to Defendant because there is no evidence that it was approved by the Commissioner. Therefore, Defendant has failed to persuade this Court that it complied with the requirements of N.J.A.C. 12:56–8.4(a).

### C.  Meal Credit

Plaintiff contends Defendant took an impermissible meal credit because it credited the retail cost of the meals as wages to its employees instead of the actual cost. Notably, Defendant does not dispute this fact. (Doc. No. 105, Pls.' SMF at ¶ 47); (Doc. No. 116, Def.'s SMF at ¶ 47). Rather, Defendant simply argues that the meal credit was reasonable. Defendant's argument is unpersuasive and nonsensical because it invents a standard that does not appear anywhere in the plain text of New Jersey's administrative code

N.J.A.C. 12:56–14.8 provides "[m]eals and lodging shall be considered applicable toward the minimum wage unless the employee elects not to receive such meals and lodging." The NJWHL defines "wages" as "any moneys due an employee from an employer for services rendered . . .  including the fair value of any food or lodgings supplied by an employer to an employee." This statute and regulation, when read together, confirm that the employer may apply the "fair value" of the meals its provides to its employees toward minimum wage. In other words, an employer can take a meal credit for the "fair value" of the meals it provides to employees. By "fair value," the regulation means "not more than the actual cost to the employer

of the food or lodging supplied by an employer." N.J.A.C. 12:56–8.1(a). Simply put, the meal

credit cannot be more than the actual cost of the food to the employer.[4]

This issue also does not stand in equipoise. During Mr. Fakouras' deposition, he admitted

that the meal credit was based on the retail cost of the food—that is, the price listed on the

menu—as opposed to the actual cost:

> Counsel: So, when I asked you before about whether or not the $8 is a discount taken off
> the retail cost of food, by retail I mean the food on the menu?
>
> Mr. Fakouras: Correct.

(Doc. No. 116, Exhibit I at 67). Indeed, Defendant concedes that "[t]he meal credit as applied by

Defendant was based on the retail cost of the meal (the price listed on the menu) rather than the

actual cost to Defendant for the meal." (Doc. No. 105, SMF at ¶ 47); (Doc. No. 116-1, Rep to

SMF at ¶ 47). Thus, the meal credit that was applied toward employees' wages was priced at a

higher rate than what it actually cost Defendant. This is in clear contravention of the regulation

and Defendant's throw-away argument that the meal credit was "reasonable" is simply

unpersuasive. Accordingly, Plaintiff is also entitled to summary judgment on this issue as well.

### D.  Motion for Final Collective Action

Plaintiffs move for final collective certification under 29 U.S.C. § 216(b) on Count I of

the Complaint. Defendant argues that this motion should be denied because it is a blatant attempt

to circumvent the rulings by the Honorable Joel Schneider, U.S.M.J., who held that Defendant

"is entitled to take discovery as to NJWHL issues . . . [and] is also entitled to take discovery

directed to plaintiffs' damages." (Doc. No. 115-8, Exhibit G). We fail to see how granting

Plaintiffs' motion for certification of the final collective action for its FLSA minimum wage

claim will have an impact on the discovery for the NJWHL and damages issues. *See Reinig v.*

---

[4] Thus, if the cost of the food to the employer was $8, it cannot take a $10 meal credit.

*RBS Citizens*, N.A., 912 F.3d 115, 131 (3d Cir. 2018) (noting class certification and FLSA collective action certification are fundamentally different creatures). Therefore, we will now consider whether Plaintiffs' have shown by a preponderance of the evidence that the Lead Plaintiff and Opt-In Plaintiffs are "similarly situated."

Section 16(b) of the FLSA allows an employee to bring an action against his employer individually, on his own behalf, and collectively, on behalf of other "similarly situated" employees. 29 U.S.C. § 216(b). In order to become parties to a collective action under Section 16(b), employees must affirmatively opt-in by filing written consents with the court. *Id.* This feature distinguishes the collective action mechanism under Section 16(b) from the class-action mechanism under Federal Rule of Civil Procedure 23, where, once the class is certified, those not wishing to be included in the class must affirmatively opt-out. *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013).

Courts in our Circuit follow a two-step process for deciding whether an action may properly proceed as a collective action under the FLSA. *Zavala v. Wal–Mart Stores Inc*., 691 F.3d 527, 535 (3d Cir.2012). Applying a "fairly lenient standard" at the first step, the court makes a preliminary determination as to whether the named plaintiffs have made a "modest factual showing" that the employees identified in their complaint are "similarly situated." *Id.* at 536 & n. 4. If the plaintiffs have satisfied their burden, the court will "conditionally certify" the collective action for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery. *Id.* at 536. At the second stage, with the benefit of discovery, "a court following this approach then makes a conclusive determination as to whether each plaintiff who has opted-in to the collective action is in fact similarly situated to the named plaintiff." *Symczyk v. Genesis Healthcare Corp*., 656 F.3d 189, 193 (3d Cir.2011), rev'd on other grounds, *Symczyk*,

16

133 S.Ct. at 1526. This step may be triggered by the plaintiffs' motion for "final certification," by the defendants' motion for "decertification," or, commonly, by both. If the plaintiffs succeed in carrying their heavier burden at this stage, the case may proceed on the merits as a collective action. *Id.*

We conditionally certified the collective action on March 8, 2019. (Doc. No. 35). Thus, the only question before us is whether to grant Plaintiffs' motion for final certification. At the final certification stage, the named plaintiffs bear the burden of showing that the opt-in plaintiffs are "similarly situated" to them for FLSA purposes. *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 226 (3d Cir. 2016). "Being 'similarly situated' . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Id.* (citing *Zavala*, 691 F.3d at 538). Our courts consider several factors to make this determination, including: (1) whether the plaintiffs are employed in the same corporate department, division, and location; (2) whether they advance similar claims; (3) whether they seek substantially the same form of relief; and (4) whether they have similar salaries and circumstances of employment. *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012). Plaintiffs may also be found dissimilar based on the existence of individualized defenses. *Id.* The degree of fairness and procedural impact of certifying the action as a collective action are also relevant to this analysis. *Halle v. W. Penn Allegheny Health Sys. Inc.*, 842 F.3d 215, 226 (3d Cir. 2016). Our courts employ an ad-hoc approach to this analysis, considering all relevant factors and make a determination on a case-by-case basis as to whether the named plaintiffs have satisfied this burden by a preponderance of the evidence. *Zavala*, 691 F.3d at 536–37.

Named Plaintiff Casco has made the requisite showing that other tipped employees are "similarly situated" because Defendant Metro Diner failed to give sufficient notice to its tipped

17

employees that it used a tip credit to satisfy the FLSA's minimum wage requirement. That is, the tipped employees were subjected to a common employer practice that constitutes a violation of the FLSA. Consideration of the facts set forth above also confirms this conclusion.

The first factor is easily met here because the named plaintiffs and the opt-in plaintiffs worked at a single location, the Metro Diner, as hourly and tipped employees. *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 381 (W.D. Pa. 2011) (reasoning there were many similarities among the plaintiffs that weighed against decertification, including that they were all hourly employees who worked at a single plant).

The second factor also points in favor of final certification because all plaintiffs advance the same claim—Defendant failed to provide proper notice that it used a tip credit to satisfy the FLSA's minimum wage requirements and therefore took an improper tip credit. Likewise, the third factor supports final certification because all plaintiffs seek monetary relief under the FLSA for any unpaid minimum wage they did not receive due to the improper tip credit. Courts applying *Zavala* have indicated that plaintiffs may satisfy this factor even where individual plaintiffs ultimately seek different dollar amounts of relief for their claims. *See, e.g., Adami v. Cardo Windows, Inc.*, No. 12-2804, 2016 WL 1241798, at *6 (D.N.J. Mar. 30, 2016) (finding this factor satisfied where "[p]laintiffs all bring claims for unpaid overtime compensation and seek the same type of monetary and injunctive relief, although for vastly different amounts of compensation"). While plaintiffs may have individualized amounts of damages for their minimum wage claims, the form of relief sought by each opt-in plaintiff is the same.

The fourth factor, similar salaries and employment circumstances, is a closer call but we find it weighs in favor of final certification. Lead plaintiffs and opt-in plaintiffs were all tipped employees who had a similar compensation structure: each would receive an hourly cash wage

18

from Defendant and gratuities or tips from customers. Although the actual rate of pay differed by employee, such minute differences do not automatically vitiate the collective action. As one court has aptly observed, "[i]f one zooms in close enough on anything, differences will abound." *Frank v. Gold'n Plump Poultry, Inc*., No. 04–CV–1018 (PJS/RLE), 2007 WL 2780504, at *5 (D.Minn. Sep. 24, 2007). The claims need to be viewed from a higher level of abstraction and viewing them as such, we conclude that any differences do not outweigh any similarities.

Individualized defenses are not applicable here nor has Defendant raised any because this Court already granted summary judgment in favor of Plaintiff with respect to the current issue he now seeks to certify: failure to provide sufficient notice of a tip credit in direct contravention of 203(m) of the FLSA. Fairness and procedural considerations also favor certifying the final collective action because there are not substantial differences in employment experiences such that the procedural advantages of the collective action—lower individual costs by pooling resources and judicial efficiency through resolving common issues in one proceeding—cannot be realized. Finally, Defendant's request that we find Plaintiff's motion premature trenches on Third Circuit case law. In *Zavala*, the Third Circuit held that once it has been determined that plaintiffs are similarly situated, the statute does not give the district court discretion to deny certification. *Zavala v. Wal Mart Stores Inc*., 691 F.3d 527, 535 (3d Cir. 2012). Accordingly, Plaintiff's motion for certification of the final collective action is granted.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's motion to strike is denied, but Plaintiff's motion for partial summary judgment and final collective action are granted. An order follows.

Dated:  3/9/2021                                    s/ Robert B. Kugler
                                                    ROBERT B. KUGLER
                                                    United States District Judge